**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 14, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 14, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 103006-1 |
| Respondent, | EN BANC |
| v. | Filed: August 14, 2025 |
| A.M.W., | |
| Petitioner. | |

GORDON McCLOUD, J.— A court rule, JuCR 7.16, and a state statute, RCW 13.40.040, both address when a court may issue an arrest warrant for a juvenile. But they contain different prerequisites to the issuance of such a warrant—the court rule's prerequisites are more restrictive than the statute's prerequisites. This opinion addresses a question of first impression concerning these two provisions: do they conflict and, if so, which one prevails?

The statute addressing juvenile arrest warrants, RCW 13.40.040(1)(a), states in relevant part, "A juvenile may be taken into custody . . . [p]ursuant to a court order if a complaint is filed with the court alleging, and the court finds probable cause to believe, *that the juvenile has committed an offense or has violated terms*

*of a disposition order or release order*." (Emphasis added.) A court rule, JuCR 7.16, also addresses juvenile arrest warrants. For arrest warrants based on a violation of a court order, it states, "No new warrants shall issue unless a finding is made *that the individual circumstances of the alleged 'Violation of a Court Order' pose a serious threat to public safety*." JuCR 7.16(a) (emphasis added). For arrest warrants based on a failure to appear, it similarly states, "No new warrants shall issue unless a finding is made *that the individual circumstances of the Failure to Appear poses a serious threat to public safety*." JuCR 7.16(b) (emphasis added).

Here, the trial court issued an arrest warrant for A.M.W. for violating a condition of her juvenile disposition order forbidding her from using alcohol. That court reasoned that A.M.W.'s past suicide attempt, which occurred while A.M.W. was violating that condition, satisfied JuCR 7.16's more restrictive prerequisite that the violation "pose a serious threat to public safety." JuCR 7.16(a). A.M.W. appealed, arguing that JuCR 7.16 irreconcilably conflicts with RCW 13.40.040 and that JuCR 7.16 trumped the statute because this court has power to adopt "procedural law," like the issuance of arrest warrants, while the legislature has the power to enact "substantive law."

The Court of Appeals rejected her argument. It held that the rule and the statute conflict and that despite the fact that JuCR 7.16 concerns only the procedure for issuing warrants, it amounts to a substantive rule because it limits the

2

State's ability to enforce the Juvenile Justice Act of 1977, ch. 13.40 RCW. That appellate court further held that because it is a rule on a substantive matter, it falls outside this court's rule-making power. *State v. A.M.W.*, 30 Wn. App. 2d 472, 545 P.3d 394 (2024).

We reverse. We adhere to our prior precedent and hold that JuCR 7.16—like all rules concerning court process such as warrants—is a procedural rule. We further hold that because JuCR 7.16 is a procedural rule, it falls squarely within this court's inherent, constitutional, and statutory power to adopt rules of court procedure. Finally, we hold that JuCR 7.16 can be harmonized with RCW 13.40.040 because a trial court can apply both sets of prerequisites before issuing a warrant. We also take this opportunity to provide guidance on the correct application of JuCR 7.16's directive that trial courts base their decisions on "the individual circumstances of the alleged" violation or failure to appear. JuCR 7.16(a), (b).

FACTS AND PROCEDURAL HISTORY

I.     Disposition and issuance of bench warrant

The relevant facts of the case are undisputed. In March 2022, 13-year-old A.M.W. pleaded guilty to one count of fourth degree assault based on an altercation with her family members. Sealed Clerk's Papers (CP) at 7-14. The court accepted her plea and imposed a seven-month term of community supervision and

3

numerous conditions. CP at 17-21 (ord.). The conditions included attending school, reporting to a probation officer, abiding by a curfew, refraining from drug and alcohol use, residing in her mother's home, attending all mental health appointments and taking prescribed medications, and refraining from committing new crimes. *Id.* at 20-21.

On March 11, 2022, the State moved for a bench warrant. *Id.* at 27-31. It alleged that A.M.W. posed a serious threat to public safety under JuCR 7.16 (without specifying the subsection of the rule under which it was proceeding). It recited the facts giving rise to the March 1 disposition order. *Id.* at 28. It then explained that A.M.W. was associating with D.H., an older male with an extensive criminal history (as well as a pending criminal investigation in which he was a suspect in second-degree child molestation with A.M.W. as the alleged victim) and alleged gang ties. *Id.* The State asserted that *D.H.*'s "criminal history, *his* other alleged criminal behavior, and the significant age difference existing between he and the respondent not only places the respondent in peril, but creates a situation where she too poses a serious threat to community safety." *Id.* at 29 (emphasis added). A.M.W.'s attorney opposed issuance of the warrant, arguing that the State's allegations certainly described a threat to A.M.W.'s own, individual safety, but that those allegations did not show that A.M.W. herself posed a serious threat to public safety. *Id.* at 32-35. This difference is important because JuCR 7.16 does

4

not allow a juvenile court to issue a warrant to incarcerate a juvenile who poses a threat to her own safety; it allows a juvenile court to issue such a warrant only if the juvenile poses a "serious threat" to "public safety." *Id.* at 33-35.

The record is unclear as to whether the juvenile court issued a bench warrant that day. The State moved for another bench warrant on March 14, asserting identical facts. *Id.* at 36-39. The record is likewise unclear on whether the court granted that motion.

Over the next few months, however, A.M.W. violated the terms of the disposition order several times. The State sought, and the court granted, five modifications of the disposition order based on those violations. Verbatim Rep. of Proc. (VRP) at 5.

On July 18, 2022, the State again moved the court to issue a bench warrant. CP at 51-54. This time, the State alleged that A.M.W. violated four court-ordered conditions: "Contact w/Probation Officer," "Drug/Alcohol Use," "Curfew," and "Other." *Id.* at 54 (Ex. A – request for court action). According to the probation officer's report, A.M.W. attempted suicide on June 1, 2022 at a local bridge while drinking with D.H. *Id.* Then, on July 13, A.M.W. left her mother's home and still had not returned by July 18, the date the State filed the motion. *Id.* at 52. A.M.W.'s mother reported that A.M.W. threatened suicide over the phone on July 14. *Id.* Later that day, A.M.W.'s mother saw A.M.W. and D.H. drinking downtown, but

they fled when she approached. *Id.* The State also alleged that A.M.W. was not taking her prescribed medications while "on the run." VRP at 7.

In addition to these allegations, the State's July 18 bench warrant motion repeated its prior allegations regarding D.H.'s dangerousness. CP at 52. The motion further alleged that A.M.W. had a pending charge of second degree malicious mischief (with D.H. as codefendant) relating to vandalism and was under pretrial release conditions for that charge. *Id.* at 52-53; VRP at 6. The State repeated its assertion that A.M.W.'s involvement with D.H. "not only places [A.M.W.] in peril, but creates a situation where she too poses a serious threat to community safety." CP at 53; VRP at 8.

A.M.W. opposed for the same reasons as before: she argued that the State's request for a bench warrant was based on concerns about A.M.W.'s personal safety and that JuCR 7.16 does not permit the court to issue a warrant for that reason. CP at 60-63.

The juvenile court held a hearing on the State's motion immediately, on July 19. The State provided more detail about A.M.W.'s suicide attempt. VRP at 6-7. According to a police report, A.M.W. was intoxicated and got into an argument with D.H. on the Monroe Street Bridge in Spokane. *Id.* Bystanders reported seeing her swinging her leg over the side of the bridge; they pulled her back down and held her until police arrived. *Id.* A.M.W. struggled with the police officers, and

6

when first responders arrived, A.M.W. allegedly attempted to bite them. *Id.* The

State's argument about dangerousness remained focused on A.M.W.'s

vulnerability and danger to herself, rather than on assaulting the first responders:

> There's no question that this young woman poses a serious danger to herself. She is suicidal. She is not taking her prescribed medications. She has untreated alcohol and drug issues as well as untreated mental health issues. She's extremely vulnerable. She's 14 years old, and she's essentially living on the streets. She's in a relationship with an 18-year-old man who is gang involved. He is a suspect in several alleged sex crimes where [A.M.W.] is identified as the victim.

*Id.* at 7-8. The State also alleged that there had been "numerous run reports and

incidents where police have had to respond to situations where [A.M.W.] has been

present or involved," which "takes officers away from other calls, other duties, and

other responsibilities in the community." *Id.* at 9.

A.M.W.'s attorney argued that the State's request for a warrant was still

focused on D.H.'s dangerousness. *Id.* She acknowledged the serious concerns

about A.M.W.'s behavior but argued that A.M.W.'s actions posed individual safety

issues, not serious public safety threats under JuCR 7.16. *Id.* at 10.

Judge McKay orally ruled that a bench warrant could issue under JuCR 7.16.

*Id.* at 12-16. She noted that A.M.W. had continually violated her disposition

orders. *Id.* at 12-13. Stating that "I think that I can make [JuCR] 7.16 as well as

[RCW] 13.40[.040] work together," Judge McKay ruled that A.M.W. posed a

serious threat to public safety "based upon her attempt of suicide as well as the fact that she was intoxicated at the time." *Id.* at 14. The judge elaborated:

> There is law enforcement. There is fire. There is EMS that responds to suicide situations, and they put themselves at risk every time they do that when making a response to this child's actions. In addition to that, when they are assisting this child, they are not assisting other areas of this community which do need help. So, I can consider that a substantial and significant community safety risk.

*Id.* at 14-15. Judge McKay also ruled that A.M.W.'s drug and alcohol use and her failure to take prescribed mental health medication—both violations of the disposition order—"also puts society as a whole at risk and it is substantial in nature." *Id.* at 15. In other words, the court did not rely on A.M.W.'s alleged assaults on the first responders.

Judge McKay issued a bench warrant. CP at 68-69. In a separate order, the judge entered findings that A.M.W. met the JuCR 7.16 "serious threat to public safety" standard for the following reasons:

> "[1] Based on not complying with the court's orders and is thereby not available for rehabilitation,
> [2] Her suicidal tendencies put other community members at risk,
> [3] Youth has untreated mental health and substance issues that put the community at risk."

CP at 64 (Ord.).

II.     Appeal

A.M.W. appealed.[1] In a split, published opinion, the Court of Appeals first ruled that—as both parties by then agreed—the facts supporting the bench warrant ruling did not meet JuCR 7.16's "serious threat to public safety" standard because the connection between A.M.W.'s hypothetical future suicide attempts and the strain it could put on first responders was "too attenuated." *A.M.W.*, 30 Wn. App. 2d at 480. (Neither the parties nor the appellate court mentioned A.M.W.'s alleged assaults on the first responders, which the State never asserted as a threat to public safety and which the judge never identified as a threat to public safety.)

But the majority also ruled that JuCR 7.16 irreconcilably conflicted with RCW 13.40.040. That presented the question of which one controlled—the court rule or the conflicting statute. The general rule used to answer this question is that based on constitutional separation of powers principles and statutes implementing those principles, court rules control on matters of procedure but statutes control on matters of substantive law. *State v. Gresham*, 173 Wn.2d 405, 428-29, 269 P.3d 207 (2012) (quoting *Putman v. Wenatchee Valley Med. Ctr., PS*, 166 Wn.2d 974, 980, 216 P.3d 374 (2009)). Applying that rule, the Court of Appeals' majority

---

[1] The Court of Appeals ruled that the bench warrant order was not appealable as a matter of right, but it accepted discretionary review under RAP 2.3(b)(4). Comm'r's Ruling, *State v. A.M.W.*, No. 39113-2-III (Wash. Ct. App. Sept. 29, 2022).

accurately reasoned that it had to determine whether JuCR 7.16 was substantive or procedural. *A.M.W.*, 30 Wn. App. 2d. at 483.

The appellate court majority, however, concluded that JuCR 7.16 was substantive. It began by interpreting JuCR 7.16 as creating "a categorical bar to the issuance of warrants that would otherwise be proper under RCW 13.40.040" and concluded that this bar stopped courts from "comprehensive enforcement of the Juvenile Justice Act as to all juvenile offenders as contemplated by RCW 13.40.010." *Id.* It continued that the "restrictions placed on a judge's statutory warrant authority by JuCR 7.16 render the Juvenile Justice Act a voluntary system for all but the most serious offenders." *Id.* at 482-83.

Because JuCR 7.16 "restrict[ed] courts from holding juveniles accountable as contemplated by the Juvenile Justice Act unless the juvenile presents a serious threat to public safety," the court ruled that JuCR 7.16 constituted a policy decision by the Washington Supreme Court that "conflicts with the legislature's policy choice that the Juvenile Justice Act should apply to all juveniles who violate criminal statutes, not just those who pose grave risks to the community." *Id.* at 484. Based on this perceived conflict, the court concluded that JuCR 7.16 "is a substantive rule that cannot be enforced in the face of the Juvenile Justice Act." *Id.* at 488.

One judge dissented. He agreed with the majority that the rule conflicted with the statute. But he would have held that the court rule controlled over the statute because arrest warrants are procedural matters under this court's control, rather than substantive matters under the legislature's control. *Id.* at 510 (Fearing, C.J., dissenting). He disagreed with the majority's conclusion that a procedural court rule's big effect on substantive law makes the rule itself substantive—he noted that most procedural rules have some effect, sometimes a very big effect, on the application of substantive law. *Id.* at 490.

A.M.W. petitioned for review, which this court granted. Ord., *State v. A.M.W.*, No. 103006-1 (Wash. July 15, 2024). King County Department of Public Defense and the Washington State Office of Public Defense filed an amicus brief in support of review. Following acceptance of review, a group of retired Washington Superior Court Judges and Juvenile Court Administrators filed an amicus brief arguing for affirmance of the Court of Appeals decision and also urging this court's members to recuse themselves from this case.[2]

---

[2] This case was initially consolidated with *State v. J.M.H.*, No. 102658-7. The consolidation was severed November 25, 2024.

ANALYSIS[3]

I.     This court has inherent, constitutional, and statutory authority to adopt rules governing court procedure

This court's "power to prescribe rules for procedure and practice" is inherent, constitutional, and statutory. *State v. Smith*, 84 Wn.2d 498, 501, 527 P.2d 674 (1974) (collecting cases).[4] As we have stated many times, it is "an inherent power of the judicial branch and flows from article IV, section 1 of the Washington Constitution." *Gresham*, 173 Wn.2d at 428 (citation omitted) (citing *Smith*, 84 Wn. 2d at 501; *State v. Fields*, 85 Wn.2d 126, 129, 530 P.2d 284 (1975)); *see also State*

---

[3] This case is moot because this court can no longer provide effective relief to the parties. *In re Marriage of Horner*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004). However, we may take review of a moot case if it presents issues of continuing and substantial public interest. *Id.* The constitutionality and application of JuCR 7.16 is precisely this type of issue. Further, the issue will inevitably recur, and this court's authoritative guidance will help provide future guidance to public officers. *Westerman v. Cary*, 125 Wn.2d 277, 286-87, 892 P.2d 1067 (1994). Review of this moot case is warranted.

[4] The dissent asserts that our "claim" that "rule making is an 'inherent' authority of the court . . . is not supported by history or our case law spanning many decades." Dissent at 11. In direct contradiction to that assertion, the dissent later acknowledges that in "numerous" controlling decisions spanning the past 50 years, we have held that this court possesses inherent authority to promulgate rules governing Washington court procedures. *Id.* at 16 n.2 (collecting cases); *see also id.* at 22-23 (stating that this court possesses "inherent power" to "prescrib[e] rules" governing court procedure). The dissent opines that we should now overrule that controlling precedent. *Id.* at 21-23. But the dissent is the only voice to make that call. It fails to mention that the parties have not asked us to overrule that precedent; amici have not asked us to overrule that precedent; and we do not take the drastic step of overruling precedent unless we are convinced that the precedent is both incorrect and harmful. We are not convinced of that; apparently, the parties to this case were not convinced of that, either.

*ex rel. Foster-Wyman Lumber Co. v. Superior Court*, 148 Wash. 1, 3, 267 P. 770 (1928).

This court's power to create procedural court rules has also been recognized by the legislature in RCW 2.04.190 and RCW 2.04.200. *Gresham*, 173 Wn.2d at 428. In RCW 2.04.190, the legislature acknowledged that

> [t]he supreme court shall have the power to prescribe, from time to time, *the forms of writs and all other process*, the mode and manner of framing and filing proceedings and pleadings; *of giving notice and serving writs and process of all kinds*; of taking and obtaining evidence; of drawing up, entering and enrolling orders and judgments; and *generally to regulate and prescribe by rule the forms for and the kind and character of the entire pleading, practice and procedure to be used in all suits, actions, appeals and proceedings* of *whatever nature by the supreme court, superior courts, and district courts of the state*.

(Emphasis added.) The legislature also recognized that when this court adopts such rules, "all laws in conflict therewith shall be and become of no further force or effect." RCW 2.04.200.

To be sure, we recognize that "[t]he legislature may also adopt, by statute, rules governing court procedures." *Gresham*, 173 Wn.2d at 428. In our system of separation of powers, "[o]ne branch of government may engage in functions that intervene in or overlap with the functions of another branch, so long as it does not undermine the operation of that other branch 'or undermine the rule of law which all branches are committed to maintain.'" *In re Int. of Mowery*, 141 Wn. App. 263,

13

281, 169 P.3d 835 (2007) (quoting *In re Salary of Juv. Dir.*, 87 Wn.2d 232, 243, 552 P.2d 163 (1976)).

But in accordance with those separation of powers principles, the Washington Constitution places the final say on issues of court procedure in the hands of this Court—even if our procedural rules "contradict rules established by the legislature." *Marine Power & Equip. Co. v. Dep't of Transp.*, 102 Wn.2d 457, 461, 687 P.2d 202 (1984) (citing WASH. CONST. art. IV, § 1; *Fields*, 85 Wn.2d 126).

II.     JuCR 7.16 is a rule governing court procedure—the issuance of bench warrants—so its adoption falls squarely within this court's inherent, constitutional, and statutory authority

With this framework in mind, we consider the difference between substantive rules and procedural rules. Substantive law "prescribes norms for societal conduct and punishments for violations thereof. It thus creates, defines, and regulates primary rights." *Smith*, 84 Wn.2d at 501 (citing *State v. Pavelich*, 153 Wash. 379, 383-84, 279 P. 1102 (1929); *In re Fla. Rules of Crim. Proc.*, 272 So. 2d 65 (Fla. 1972) (per curiam memorandum)).

By contrast, procedural laws "pertain to the essentially mechanical operations of the courts by which substantive law, rights, and remedies are effectuated." *Id.* Procedure includes "'all steps and proceedings in a cause from its commencement to its conclusion.'" *Fields*, 85 Wn.2d at 130 (quoting *Mobley v.*

*Jackson*, 40 Ga. App. 761, 766, 151 S.E. 522 (1930)). Most notably, procedure

encompasses "'*any form* of order, writ, summons or notice given by authority of

law for the purpose of acquiring jurisdiction of a person *or bringing him into court

to answer*.'" *Id.* at 129 (emphasis added) (quoting *Cutler v. Cutler*, 28 Misc. 2d

526, 528, 217 N.Y.S.2d 185 (Sup. Ct. 1961)).

A bench warrant is issued precisely for the purpose of "'bringing [the

person] into court to answer.'" *Id*. (quoting *Cutler*, 28 Misc. 2d at 528). Therefore,

court rules like JuCR 7.16 that relate to the issuance of bench warrants must be

considered procedural under this controlling precedent.

In fact, in *Fields*, we explicitly held that search warrants are procedural, not

substantive. *Id.* at 129-30. In that case, the trial court quashed a search warrant that

was authorized by court rule on the ground that it was not authorized by statute. *Id.*

at 127. We reversed. We held that the warrant was valid despite the lack of

statutory authorization because the "search warrant is part of the criminal process"

and was thus properly controlled by the court rule. *Id.* at 129-30.

While *Fields* dealt with search warrants, our opinion made clear that *arrest*

warrants also fall within this court's procedural authority because procedure

includes "'*any . . . writ . . .* given by authority of law for the purpose of acquiring

jurisdiction of a person or bringing him into court to answer.'" *Id.* at 129 (emphasis

added) (quoting *Cutler*, 28 Misc. 2d at 528). And if there is any question about

whether an arrest warrant is a writ, the arrest warrant in this case explicitly states, "Herein fail not, and have you then and there *this writ*." CP at 68 (emphasis added).

Thus, under controlling precedent, JuCR 7.16 is clearly procedural in nature. JuCR 7.16 deals with warrants; warrants are writs; writs are procedural matters; and the court has inherent, constitutional, and statutory authority over procedural matters. It necessarily follows that this court had the authority to adopt JuCR 7.16.

The State argues that although court rules might generally be considered procedural, JuCR 7.16 has such a big impact on the court's ability to enforce the Juvenile Justice Act that JuCR 7.16 must be considered substantive (and, hence, outside of this court's rule making authority). The State explains that no matter how procedural JuCR 7.16 might look, it limits the State's ability to bring juveniles into court and proceed against them, so it threatens to undermine the enforcement of the entire Juvenile Justice Act. The State provides no empirical support for this assertion.[5]

---

[5] Amici King County Public Defenders et al. state that in King County, only 0.01 percent of youth charged in King County Juvenile Court were on "Failure to Appear Status" between 2020 and 2023. Mem. of Amici Curiae of King County Dep't of Pub. Def. & Wash. State Off. of Pub. Def. in Supp. of Pet. for Rev. at 10. JuCR 7.16 has been in effect since February 1, 2021. Thus, "in this charging period, at least 98.3 percent of the King County juveniles who remained in the system appear not to have needed arrest warrants to compel their presence." Suppl. Br. of Pet'r A.M.W. at 31.

16

But even more importantly, the State (and the Court of Appeals) provides no support for its claim that a procedural rule that has a big effect on the enforceability of a substantive law must be considered substantive, even though it regulates a matter of procedure. We find no support for that claim, either.

In fact, controlling case law holds to the contrary. In *Smith*, we analyzed a statute that prohibited release on bail of any defendant appealing from conviction of a capital crime. 84 Wn.2d at 500. But a court rule mandated bail for such appellants unless they were a flight risk or posed a "'substantial danger to another or to the community.'" *Id.* at 500-01 (quoting former CrR 3.2(h) (1973)). We concluded that the court rule trumped the contrary statute. We reasoned, "Since the inherent power to fix bail is grounded in the power to hold a defendant, and thus relates to the *manner* of ensuring that the alleged offense will be heard by the court, we believe it to be implicit that the right to bail is essentially procedural in nature." *Id.* at 502.

The court rule in *Smith* is comparable to the court rule in this case. The *Smith* court rule could have a big effect on the enforceability of substantive law: a person convicted of a capital crime who is released on bail could flee, undermining the State's ability to enforce the conviction. But in *Smith*, the mere possibility of this negative outcome did not transform the procedural nature of the bail rule into substantive law. Likewise, the fact that JuCR 7.16 limits juvenile arrest warrants

17

more than RCW 13.40.040 does cannot transform the inherently procedural nature of an arrest warrant rule into substantive law.

We have come to the exact same conclusion concerning court rules on other procedural subjects that conflicted with statutes on those same subjects. For example, we have held that rules of evidence are procedural—even though rules pertaining to the admission of evidence have significant and often outcome-determinative effects on the State's ability to prosecute violations of substantive law. In *Gresham*, the legislature passed a statute that permitted the introduction of character evidence in certain criminal cases—evidence that would be inadmissible under Evidence Rule 404(b). 173 Wn.2d at 429. We held that the statute conflicted with ER 404(b) and that the two could not be harmonized. We continued that because the Evidence Rules are procedural in nature—since "admission of evidence is simply the means by which . . . substantive law is effectuated"—they trumped the conflicting statute on the same topic. *Id.* at 431-32 (citing *Smith*, 84 Wn.2d at 501; *Foster-Wyman Lumber Co.*, 148 Wash. at 14). We therefore ruled that the statute was invalid. *Id.* at 432; *see also Putman*, 166 Wn.2d at 983 (statute that required medical malpractice plaintiffs to file an additional document not required by court rule irreconcilably conflicted with CR 8, and CR 8 as a procedural rule trumped the statute).

Finally, the State's assertion that a procedural rule that has a big effect on the enforceability of a substantive law must be considered substantive, even though it regulates a matter of procedure, is foreclosed by numerous recent, controlling cases discussing the retroactivity of *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017), on collateral review. In *Houston-Sconiers*, we announced a substantive constitutional rule: that the Eighth Amendment bars "adult standard SRA[6] ranges and enhancements that would be disproportionate punishment for juveniles who possess diminished culpability." *In re Pers. Restraint of Ali*, 196 Wn.2d 220, 237, 474 P.3d 507 (2020) (citing *Houston-Sconiers*, 188 Wn.2d 1); U.S. CONST. amend. VIII. *Houston-Sconiers* also laid out two mandates that we said were "necessary to effectuate that substantive rule": first, that sentencing courts "must consider the mitigating qualities of youth" and second, that such courts must "have discretion to impose sentences below what the SRA mandates." *Ali*, 196 Wn.2d at 237-38 (citing *Houston-Sconiers*, 188 Wn.2d at 19). Later cases held that these "dual mandates" are procedural, not substantive, and thus are not independently retroactive on collateral review. *In re Pers. Restraint of Williams*, 200 Wn.2d 622, 632, 520 P.3d 933 (2022).

In other words, although we explicitly recognized the immense impact that the procedural rules have on the protection of children's constitutional right to be

---

[6] Sentencing Reform Act of 1981, ch. 9.94A RCW.

19

free of cruel and unusual punishment, we declined to hold that this impact transformed the procedural rules into substantive rules. *See In re Pers. Restraint of Hinton*, 1 Wn.3d 317, 330-31, 525 P.3d 156 (2023) (citing *Ali*, 196 Wn.2d at 239); *In re Pers. Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 474 P.3d 524 (2020); *In re Pers. Restraint of Carrasco*, 1 Wn.3d 224, 525 P.3d 196 (2023); *Williams*, 200 Wn.2d at 622.

Based on this controlling precedent, we must conclude that JuCR 7.16 is procedural in nature and that the rule thus falls within this court's inherent, constitutional, rule making authority. The next question is whether JuCR 7.16 and RCW 13.40.040 conflict—in which case JuCR 7.16 controls—or whether they can be harmonized.

III. JuCR 7.16 can be harmonized with RCW 13.40.040 because the trial court can apply both sets of prerequisites before issuing a warrant

As discussed above, JuCR 7.16 is clearly procedural. It would control over the statute if the two stood in conflict. *Putman*, 166 Wn.2d at 980.

But before declaring that they conflict, we must "'first attempt to harmonize them and give effect to both'" if possible. *Gresham*, 173 Wn.2d at 428-29 (quoting *Putman*, 166 Wn.2d at 980). Only if we cannot harmonize the rule and the statute do we invalidate the impermissible statutory provision. *Wash. State Council of County & City Emps. v. Hahn*, 151 Wn.2d 163, 168-69, 86 P.3d 774  (2004).

20

The parties both argue that the rule and the statute cannot be harmonized. The State argues that the two can't be harmonized because JuCR 7.16 bars courts from issuing warrants that they could otherwise issue under RCW 13.40.040. Suppl. Br. of Resp't at 14-15. A.M.W. essentially argues that because JuCR 7.16 is a procedural rule, it automatically controls over the statute. Suppl. Br. of Pet'r A.M.W. at 15.

We disagree that the statute stands in irreconcilable conflict with the court rule. We begin by interpreting the language of each provision, then determining whether the provisions can be harmonized. *State v. Thomas*, 121 Wn.2d 504, 512-13, 851 P.2d 673 (1993); *Gresham*, 173 Wn.2d at 428-29.

"The meaning of a statute is a question of law reviewed de novo." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Our objective in statutory interpretation "is to ascertain and carry out the Legislature's intent." *Id.* If a "statute's meaning is plain on its face," then we "give effect to that plain meaning as an expression of legislative intent." *Id*. at 9-10 (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). And we derive a given statute's plain meaning "from the ordinary meaning of the language at issue, . . . the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005) (citing *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d

462 (2003); *Campbell & Gwinn*, 146 Wn.2d at 10-12). We apply the same interpretive principles to court rules. *In re Disciplinary Proceeding Against King*, 168 Wn.2d 888, 899, 232 P.3d 1095 (2010) (quoting *State v. Chhom*, 162 Wn.2d 451, 458, 173 P.3d 234 (2007)).

As stated, RCW 13.40.040(1)(a) provides in relevant part that "[a] juvenile may be taken into custody…[p]ursuant to a court order if a complaint is filed with the court alleging, and the court finds probable cause to believe, that the juvenile has committed an offense or has violated terms of a disposition order or release order." JuCR 7.16, on the other hand, bars the court from issuing a warrant based on a juvenile's violation of a court order or failure to appear unless the court makes a finding that the "individual circumstances" of the alleged violation or failure to appear "pose[] a serious threat to public safety." JuCr 7.16(a), (b).

JuCR 7.16 and RCW 13.40.040(1)(a) can be harmonized by treating them as distinct but equally valid prerequisites to issuance of a bench warrant. Under the statute, the court must find "probable cause to believe[] that the juvenile has committed an offense or has violated terms of a disposition order or release order." RCW 13.40.040(1)(a). Under the rule, the court must find that the violation in RCW 13.40.040(1)(a) poses a "serious threat to public safety." JuCR 7.16(a)-(b). It is possible for the court to make both findings. If it does, then it can issue the bench warrant.

We followed this approach in *Thomas*, a case that also dealt with apparently conflicting statutory- and rule-based warrant requirements. 121 Wn.2d 504. In *Thomas*, the court analyzed a statute that said a search warrant must be returned "'within three days'" and a court rule that said a warrant "'shall command the officer to search, within a specified period of time not to exceed 10 days.'" *Id.* at 507-08 (emphasis omitted) (quoting RCW 69.50.509 and CrR 2.3). The defendant argued that the statute controlled over the rule and so the warrant should be both executed *and* returned within 3 days of issuance. *Id.* at 508. We disagreed; we held that "search warrants for controlled substances must be executed within 10 days *of issuance*" under the court rule "and returned within 3 days *of execution* pursuant" to the statute. *Id.* at 513 (emphasis added). With those interpretations of the triggering date for execution and return—triggering dates that were not necessarily apparent from the language of the statute—we were able to harmonize the two provisions. The same approach applies here.

And, even if the court rule and the statute did irreconcilably conflict, the procedural court rule would control over the procedural statute, as discussed in Part I above. *Gresham*, 173 Wn.2d at 428-29.

IV. Under JuCR 7.16, the "individual circumstances" of the given violation must pose a "serious threat to public safety" before a warrant can issue

Both parties agreed on appeal that the juvenile court erred in its application of JuCR 7.16 because the State provided insufficient evidence to find A.M.W.

posed a "serious threat to public safety." Answer to Pet. for Rev. at 3. The Court of Appeals agreed: "The juvenile court in this case reasoned A.M.W.'s suicidal ideation met the requirements of JuCR 7.16 because of the possible need for first responders to assist in her care. We find this concern too attenuated to qualify as a 'serious' threat to public safety." *A.M.W.*, 30 Wn. App. 2d at 480.

We agree with the Court of Appeals' holding on this issue as framed. But we take this opportunity to provide further guidance on the application of JuCR 7.16.

We begin by looking again at the relevant phrases in JuCR 7.16. That rule provides that a warrant may issue only if the "individual circumstances" of the juvenile's failure to appear or violation of a court order pose a "serious threat to public safety." JuCR 7.16(a), (b).

We agree with A.M.W. that a "serious threat to public safety" does not encompass a threat that endangers only an individual's personal safety. If the drafters of the rule had meant to include that type of individual threat, they would have used different language. *Compare, e.g.*, RCW 13.40.040(2)(a)(ii), *with* (iii) (the Juvenile Justice Act uses the contrasting language "protect[ing] the juvenile from himself or herself" and protecting the public when "[t]he juvenile is a threat to community safety" to convey different meanings); *and* RCW 71.05.020(37)(a)(i), *with* (ii) (the Involuntary Treatment Act uses the contrasting language, the risk that "[p]hysical harm will be inflicted by a person upon his or

her own person" and the risk that "physical harm will be inflicted by a person upon another" to convey different meanings). While a youth's threats or attempts to self-harm clearly pose a serious threat to the youth's safety—and require immediate attention and treatment—the language of the rule requires a serious threat to *public safety*.

The "individual circumstances" of the juvenile's alleged court order violation or failure to appear are what the court must examine when determining if the juvenile's actions pose a serious threat of imminent harm to the community.

The use of present-tense forms of the verb "pose" in JuCr 7.16(a) and (b) reinforces the time-bounded nature of the court's factual inquiry: "The use of the present tense in a statute strongly suggests it does not extend to past actions." *Crown W. Realty, LLC v. Pollution Control Hr'gs Bd.*, 7 Wn. App. 2d 710, 738, 435 P.3d 288 (2019) (citing *Carr v. United States*, 560 U.S. 438, 449, 130 S. Ct. 2229, 176 L. Ed. 2d 1152 (2010)).

Thus, "individual circumstances" are the distinct facts surrounding the alleged violation or failure to appear—in this case, the facts surrounding the alcohol consumption and other violations—not facts from before the violation or speculation about what might happen in the future. Putting all of these terms together, the language of JuCR 7.16 means that the facts surrounding the specific

violation or failure to appear must currently present an indication of impending danger to the community as a whole, not just danger to the individual juvenile.

In this case, the juvenile court's rulings (both oral and written) largely failed to consider the "individual circumstances" of A.M.W.'s alleged violations of the disposition order. The court mentioned several times the concerns arising out of A.M.W.'s association with D.H., although the disposition order had never been modified to forbid her from associating with him. The court focused on A.M.W.'s prior violations of her supervision conditions and discussed her current pending charges in another case to reach general conclusions that A.M.W. had "some serious issues with drug[s] and alcohol" and "mental health issues." VRP at 12-14. With the exception of a discussion of A.M.W.'s suicide attempt (discussed below), the court did not provide any further analysis about why these all constituted violations or whether the ones that did constitute violations posed a current serious threat to public safety. *See id.* at 14-15.

The court engaged in a closer analysis of the individual circumstances of A.M.W.'s attempted suicide. It noted that the attempt occurred while A.M.W. was allegedly intoxicated. *Id.* at 14. But the court's reasoning as to why the attempt posed a serious threat to public safety was erroneous. The court's focus was on the possibility that first responders might need to assist A.M.W. in the future should any further attempts at self-harm occur and that such response would take

resources away from other emergencies. *Id.* at 14-15. As the Court of Appeals held, this concern is "too attenuated to qualify as a 'serious' threat to public safety." *A.M.W.*, 30 Wn. App. 2d at 480.

But neither the parties nor the court mentioned the juvenile's alleged assaults on the first responders as a threat to public safety. It is certainly possible that the threat of future serious assaultive conduct could meet JuCR 7.16's standard.

Further, neither the parties nor the court mentioned a different, predictable consequence of A.M.W.'s suicide attempt. It is certainly predictable that a child's suicide attempt in a public place at a roadway would prompt more caring members of the public to try to rescue and restrain that child and, hence, could also meet JuCR 7.16's "serious threat to public safety" standard. The alleged circumstances of this tragic incident threatened not only A.M.W.'s life but potentially also the safety of community members and valuable first responders who could have been harmed while trying to help. We mention these details to emphasize that in applying JuCR 7.16, courts must carefully consider all relevant facts presented and articulate how and why they support the finding of serious threat to public safety.

Finally, JuCR 7.16 also requires the court to find that the serious threat remains at the time it is asked to issue an arrest warrant. Here, the court issued the bench warrant on July 19, over a month after A.M.W.'s June 1 suicide attempt. There was no substantive discussion on this record about whether, even if the

27

individual circumstances of A.M.W.'s violation posed a serious threat to the public on June 1, those circumstances continued to pose such a threat on July 19.

Under JuCR 7.16, the court must carefully consider whether the juvenile's violation or failure to appear poses a serious threat of harm to the community, not just to the juvenile—a threat that must be ongoing at the time the court issues a warrant.

V. We decline to recuse ourselves from hearing this case

A group of retired juvenile court judges and administrators filed a friend-of-the-court brief asking all the justices who voted on whether to adopt JuCR 7.16 to recuse themselves from—that is, to decline to hear—this case. Amicus Curiae Br. of Retired Wash. Super. Ct. Judges & Juv. Ct. Adm'rs in Supp. of Recusal & Affirmance (Amicus Br. of Retired Judges) at 10 (citing SAR 21). They have not framed this as a motion to recuse. *Id.* at 10 n.2. Instead, they ask us to recuse on our own on the ground that we have already voted on this rule: specifically, because we have rejected proposed amendments to JuCR 7.16 that criticized the rule for the reasons that the Court of Appeals used to invalidate it. *Id.* at 17-20.

We decline this request.

The Code of Judicial Conduct (CJC) governs the ethical duties of judges and justices in Washington, in our personal and professional lives, with the goal of "maintain[ing] and enhanc[ing] confidence in the legal system.' CJC pmbl. Canon

2 governs how judges should fulfill their official duties. CJC Rule 2.7 imposes on judges a "responsibility to decide" and states, "A judge shall hear and decide matters assigned to the judge, *except when disqualification or recusal is required* by Rule 2.11 or other law." (Emphasis added.) The comment to Rule 2.7 reinforces this responsibility to "hear and decide matters" absent a "require[ment]" to recuse:

> Although there are times when disqualification is necessary to protect the rights of litigants and preserve public confidence . . . judges *must* be available to decide matters that come before the courts. *Unwarranted disqualification may bring public disfavor to the court* and to the judge personally. The dignity of the court, the judge's respect for fulfillment of judicial duties, and a proper concern for the burdens that may be imposed upon the judge's colleagues require that *a judge not use disqualification or recusal to avoid cases that present difficult, controversial, or unpopular issues*.

(Emphasis added.) This CJC rule and its comment thus mandate that judges and justices hear and decide pending cases, unless recusal is *required*, not just possible.

Rule 2.2 supports this conclusion; it states, "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." CJC Rule 2.2 (asterisk omitted).

It is certainly true that CJC Rule 2.11 states that a judge must disqualify or recuse herself when "the judge's impartiality might reasonably be questioned." *See also* Amicus Br. of Retired Judges at 15 (citing *In re Disciplinary Proceeding Against Sanders*, 159 Wn.2d 517, 524, 145 P.3d 1208 (2006)). And we have not explicitly considered the exact argument that a sitting justice cannot review the

29

validity of an administrative decision, in this case a court rule, that the justices voted to adopt in their administrative capacity.

But we have implicitly considered this argument—and rejected it—by continually hearing challenges to court rules and ruling in those cases without recusal. *E.g.*, *Hanson v. Carmona*, 1 Wn.3d 362, 525 P.3d 940 (2023); *Gresham*, 173 Wn.2d 405; *Waples v. Yi*, 169 Wn.2d 152, 234 P.3d 187 (2010); *Putman*, 166 Wn.2d 974; *City of Fircrest v. Jensen*, 158 Wn.2d 384, 143 P.3d 776 (2006) (plurality opinion); *Hahn*, 151 Wn.2d 163; *Zylstra v. Piva*, 85 Wn.2d 743, 539 P.2d 823 (1975); *Fields*, 85 Wn.2d 126.

There's a good reason for this. We develop court rules in our administrative, quasi-legislative capacity rather than in our judicial capacity. Thus, adopting a rule is not like sitting on a case and then later issuing a decision on that same case. *See N.Y. State Ass'n of Crim. Def. Laws. v. Kaye*, 95 N.Y.2d 556, 562, 744 N.E.2d 123, 721 N.Y.S.2d 588 (Ct. App. 2000) (per curiam).

Our sister state courts have squarely dealt with this argument and have explicitly rejected it. Those courts hold that they *can* rule on the legal validity of their own administrative decisions, and that they have a duty to do so in their adjudicative capacity. *Id.* (rejecting motion to disqualify judges on the basis that they had voted on an administrative decision that was the subject of the lawsuit); *Lorenz v. N.H. Admin. Off. of Cts.*, 151 N.H. 440, 442, 858 A.2d 546 (2004)

30

("Courts in other jurisdictions have routinely declined to recuse themselves merely because a litigant challenges a court directive." (citing *N.Y. State Ass'n of Crim. Def. Laws.*, 95 N.Y.2d 556; *Ky. Utils. Co. v. S.E. Coal Co.*, 836 S.W.2d 407, 408 (Ky. 1992); *Off. of State Ct. Adm'r v. Background Info. Servs., Inc.*, 994 P.2d 420, 425-26 (Colo. 1999); *Berberian v. Kane*, 425 A.2d 527, 527-28 (R.I. 1981))).

In line with this weight of authority, we decline amici's recusal request.

CONCLUSION

We hold that JuCR 7.16 fully complies with the Washington State Constitution. It is a procedural rule regarding juvenile arrest warrants that represents a valid exercise of this court's inherent, constitutional, and statutory authority to promulgate rules of court procedure.

We further hold that JuCR 7.16 can be harmonized with RCW 13.40.040. JuCR 7.16 certainly adds another prerequisite to issuance of an arrest warrant for a juvenile that RCW 13.40.040 lacks. But the juvenile court can, and must, comply with both provisions at the same time. Further, even if the provisions stood in conflict, JuCR 7.16 would control over the statute because it is a procedural rule.

Finally, we decline the retired judges' request that we recuse ourselves from hearing and deciding this case.

31

Gordon McCloud, J.

WE CONCUR:

Johnson, J.

González, J.

Yu, J.

Montoya-Lewis, J.

Whitener, J.

No. 103006-1

YU, J. (concurring) — I fully concur with the majority's sound legal analysis adhering to our precedent and reversing in this case. It is well established that court rules concerning court processes, such as arrest warrants, are procedural and properly within this court's rule-making authority. Simply because a procedural rule touches on or has an effect on substantive law does not transform it into substantive law.

I write nevertheless to express my agreement with Judge Fearing's astute observations regarding the incarceration of youth of color. *See State v. A.M.W.*, 30 Wn. App. 2d 472, 508-10, 545 P.3d 394 (2024) (Fearing, C.J., dissenting). Reliable studies clearly refute the presumptions of both the trial court and the Court of Appeals that placing A.M.W. (and other similarly situated juveniles) in detention is beneficial to them. The overwhelming evidence is that detention

intended to keep a juvenile safe from themselves actually causes more harm to that youth.

In 2021, this court received the Second Report and Recommendations of the Task Force on Race in Washington's Criminal Legal System, which focused on the juvenile legal system. Among the report's many findings and recommendations, it concluded that young people who enter our juvenile legal system actually have worse outcomes "in their health, education, housing, employment, future involvement in the criminal legal system, and other measures of wellness." Task Force 2.0 Juv. Just. Subcomm., *Race in Washington's Juvenile Legal System: 2021 Report to the Washington Supreme Court*, 57 GONZ. L. REV. 636, 650 (2021). Thus, contrary to the belief that we as judges can offer better services if we incarcerate youth at risk, the report solidly concludes just the opposite: We are not helping the people we hope to help. Without adequate funding and staffing to hire professional social and health service providers, judges do more harm than good when they incarcerate youth.

The harms of incarcerating youth are well documented, as described in Section IV of the Task Force's report. The experience of incarceration alone has been shown to have a negative impact on juveniles' mental health, physical well-being, and educational outcomes, with large portions of incarcerated youth developing mental health difficulties *after* their incarceration began. The limited

or lost educational opportunities for incarcerated youth, coupled with the onset of new or worsening mental health conditions, also places them at increased risk of suicide and self-harm, and impairs their ability to obtain future employment in comparison to their peers. These harms are enormously consequential and cannot so easily be dismissed by unsubstantiated public safety concerns.

Finally, in deciding whether to incarcerate a young person, judges should consider how youth of color are overrepresented in the juvenile legal system and seek out the diversionary options provided by our legislature. *See A.M.W.*, 30 Wn. App. 2d at 509-10 (Fearing, C.J., dissenting). As detailed by amici, the disproportionate impact of arrest and detention on youth of color has long been known to be devasting in these communities. *See* Mem. of Amici Curiae King County Dep't of Pub. Def. & Wash. State Off. of Pub. Def. in Supp. of Pet. for Rev. at 5-9. Yet, the Task Force recently found that "race *still* matters in ways that are not fair, that do not advance legitimate public safety objectives, that produce racial disparities in the juvenile legal system, and that undermine public confidence that our system is intended to do justice." Task Force 2.0 Juv. Just. Subcomm., *supra*, at 698-99.

These findings should cause each one of us to closely examine and change our practices and policies. The call to commit and to develop a legal system that genuinely protects public safety while addressing the rehabilitative needs of all

youth has been delivered to us a number of times.  We should now pay heed.  For

these reasons, I respectfully concur.

_____
Yu, J.

_____
González, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

*State v. A.M.W.*

No. 103006-1

MADSEN, J. (dissenting)—Washington's legislature determined that juveniles who do not appear in court or otherwise violate court orders are subject to bench warrants. RCW 13.40.040. A court rule, JuCR 7.16, sets a stricter standard for issuing bench warrants than the statute, and therefore narrows the group of juveniles subject to RCW 13.40.040 and undermines the legislature's policy of holding juveniles accountable for their conduct. Changing the class of individuals subject to a law is a substantive decision on policy that falls to the legislature, not the courts. A juvenile court cannot comply with the both JuCR 7.16 and RCW 13.40.040, therefore the rule and statute cannot be harmonized. As a substantive matter, the statute must prevail. Because the majority arrives at the opposite conclusion, that these court rules are procedural, I respectfully dissent.

I also write separately because, contrary to the majority's assertion that this court has the inherent authority to adopt court rules, the history of rule making in Washington reflects authority over court practices and procedures that has been shared by lawmakers and judges. History also reveals that what began as a gradual delegation of rule making

power from the legislature to the judiciary ended abruptly when this court, for the first time, asserted *inherent authority* in *State v. Smith*, 84 Wn.2d 498, 501, 527 P.2d 674 (1974), which subsequent decisions interpreted as the complete and final say on procedural issues. *See* BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 55 (6th ed. 1921) (warning that some conceptions of law "once fixed, are pushed to their logical conclusions with inexorable severity").

In my view, *Smith* is a case of judicial overreaching. *Roon v. King County*, 24 Wn.2d 519, 531, 166 P.2d 165 (1946) (Mallery, J., concurring specially) ("Only self restraint stands between the judicial branch and the exercise by it of legislative functions granted to the legislative branch."). We should recognize this overreach and restore the historical equilibrium pre-*Smith* in which the legislature statutorily *delegated* and therefore *shares* rule making power with the courts. More importantly, the inherent authority this court possesses is limited to regulating internal business and whatever is necessary to maintain the independence and integrity of the judicial branch, and certainly does not extend to setting sentencing policy through court rules that contradict the legislature's statutory dictates.

## DISCUSSION

Though I would take the opportunity presented in this case to reexamine and reformulate our approach to rule making, I depart from the majority's interpretation of our rule making precedent as currently expressed.

A.  Separation of Powers

The doctrine of separation of powers recognizes that each branch of government controls its own sphere of activity.  *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 504, 198 P.3d 1021 (2009).  It is the legislature's role to set policy and enact laws.  *Id.* at 506.  The judicial branch interprets and applies those laws.  *Id.* at 505.  Courts are wary not to "arrogate to themselves any undue powers, lest they disturb the balance of power." *Wash. State Motorcycle Dealers Ass'n v. State*, 111 Wn.2d 667, 674-75, 763 P.2d 442 (1988).

Yet the separation of powers doctrine does not create "exclusive spheres" of governmental competence.  *Zylstra v. Piva*, 85 Wn.2d 743, 750, 539 P.2d 823 (1975). "'The compartmentalization of governmental powers among the executive, legislative and judicial branches has never been watertight.'"  *Id.* (quoting *In re Salaries for Prob. Officers of Bergen County*, 58 N.J. 422, 425, 278 A.2d 417 (1971)).  Harmony in cooperation between the branches is "fundamental" to the success of our government.  *Id.* When this cooperation breaks down, the judiciary necessarily exercises its power to sustain its own, separate integrity.  *Id.*  On the other hand, "[t]he judicial branch violates the doctrine when it assumes 'tasks that are more properly accomplished by [other] branches.'"  *Hale*, 165 Wn.2d at 507 (alteration in original) (internal quotation marks omitted) (quoting *Carrick v. Locke*, 125 Wn.2d 129, 136, 882 P.2d 173 (1994)).  "The question to be asked is not whether two branches of government engage in coinciding

3

activities, but rather whether the activity of one branch threatens the independence or integrity or invades the prerogatives of another." *Zylstra*, 85 Wn.2d at 750.

The legislature and the court determine rules of procedure. *See* RCW 2.04.190; *State v. Gresham*, 173 Wn.2d 405, 428, 269 P.3d 207 (2012). This does not implicate separation of powers concerns so long as it does not "undermine the operation of another branch" or the rule of law. *In re Salary of Juv. Dir.*, 87 Wn.2d 232, 243, 522 P.2d 163 (1976). When a court rule and statute conflict, the *subject matter of the laws* determines which controls. *See State v. W.W.*, 76 Wn. App. 754, 758, 887 P.2d 914 (1995). If *substantive*, the statute prevails; if *procedural*, the court rule controls. RCW 2.04.190, .200.

JuCR 7.16(a) states that warrants issued for violation of a court order related to juvenile proceedings must be quashed unless the court makes a finding that the juvenile is a "serious public safety threat." In addition, a warrant issued for a juvenile who "[f]ail[s] to [a]ppear" at a proceeding must be quashed unless supported by a finding that the juvenile is a "serious public safety threat." JuCR 7.16(b).

RCW 13.40.040 concerns the *grounds* for taking a juvenile into custody. A juvenile may be taken into custody if the court has probable cause to believe the juvenile has committed an offense or violated the terms of a disposition or release order. RCW 13.40.040(1)(a). A juvenile may also be taken into custody pursuant to a court order as a material witness or when the juvenile's parole has been suspended. RCW 13.40.040(1)(c)-(d). A juvenile may not be held in detention unless probable cause exists

4

to believe that the juvenile committed an offense or violated the terms of a disposition order and, among other things, the juvenile "will likely fail to appear" at other proceedings; detention is required to protect the juvenile from themselves; the juvenile is a threat to the safety of the community, will intimidate a witness or interfere with the administration of justice, or has committed a crime during the pendency of another case. RCW 13.04.040(2)(a).

Though the line between substance and procedure can sometimes be vague and indistinct, we can draw a clear line in this case. JuCR 7.16 sets a stricter standard than the statute for a court to issue bench warrants for juveniles who violate court orders or violate parole conditions. That is, the court rule narrows the legislatively determined group of individuals who will be subject to the Juvenile Justice Act of 1977, ch. 13.40 RCW. *See Schriro v. Summerlin*, 542 U.S. 348, 353, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004) ("A rule is substantive rather than procedural if it alters the range of conduct or the *class of persons* that the law punishes." (emphasis added)). As a substantive matter, it falls to the legislature to set policy and enact the law, and to prescribe criminal penalties. *Hale*, 165 Wn.2d at 506; *In re Pers. Restraint of Forcha-Williams*, 200 Wn.2d 581, 591, 520 P.3d 939 (2022) (stating that setting penalties and punishments for criminal offenses is a legislative function). Here, the legislature made the policy determination that juveniles who fail to appear or otherwise violate a court order should be held accountable. By prohibiting a trial judge from issuing a warrant to bring the juvenile before the court through issuance of a bench warrant, JuCR 7.16 thwarts that policy and

5

contradicts the statutory provisions. RCW 13.40.040(1), .010(2)(c) ("[T]he legislature declares the following to be equally important purposes of this chapter: . . . Make the juvenile offender accountable for his or her criminal behavior.").

Moreover, JuCR 7.16 says nothing about procedures for the conduct of court business. For example, RCW 13.40.040(1)(c) provides that by court order, a juvenile may be taken into detention to be held as a material witness, but if the juvenile violates that order, JuCR 7.16 requires the order to be quashed unless there is a finding that the juvenile is a serious public safety threat. The rule does not concern a court's manner of issuing a warrant (on a particular day), its form (using a certain approved form), or mechanism to be used for bringing the juvenile into court (writ of habeas corpus, subpoena, material witness warrant). *See State v. Pavelich*, 153 Wash. 379, 381, 279 P. 1102 (1929) ("'form, manner and order of carrying on and conducting suits or prosecutions'" constitutes court procedures (quoting 31 CYC. *Practice* 1153 (1909)).

Rather, the rule depends on a *juvenile's behavior*. The behavior of failing to appear constitutes the crime of bail jumping. RCW 13.40.040(5). Regulating behavior through criminal statutes and fixing the punishments for their violation is a plenary legislative function. *Forcha-Williams*, 200 Wn.2d at 591. Thus, JuCR 7.16 prevents holding juveniles accountable for the separate and legislatively determined offense of bail jumping, and it reduces the authority of the executive branch to carry out its duty to prosecute that offense. *Colvin v. Inslee*, 195 Wn.2d 879, 892, 467 P.3d 953 (2020) ("The legislative branch writes laws, the executive branch faithfully executes those laws."

6

(citations omitted)).  This impedes the executive branch and intrudes into the legislature's

sphere of influence.  *Zylstra*, 85 Wn.2d at 750 (a branch violates the separation of power

when "the activity of one branch threatens the independence or integrity or invades the

prerogatives of another").

The majority concludes that JuCR 7.16 is procedural.  It hangs its hat on the

notion that process is "'*any form* of order, writ, summons or notice given by authority of

law" for "'*bringing* [someone] *into court to answer*."  Majority at 14-15 (quoting *State v.*

*Fields*, 85 Wn.2d 126, 129, 530 P.2d 284 (1975)).  On this point, I agree.  If the rule and

statute at issue here (and in *Fields*) concerned the *form* of a writ—required that the

warrant to be printed on purple paper or using only Comic Sans font—they would

undoubtedly qualify as process and fall under this court's purview.  *See Smith*, 84 Wn.2d

at 501 (procedural rules "pertain to the essentially mechanical operations of the courts.");

*Pavelich*, 153 Wash. at 381 ("[W]hat constitutes practice and procedure in the law is . . .

'the form, manner and order of carrying on and conducting suits or prosecutions.'"

(quoting 31 CYC. *Practice*, *supra*, at 1153)).

The rule in this case does substantially more.  JuCR 7.16 restricts the grounds on

which a warrant *may issue at all*.  JuCR 7.16 prevents courts from utilizing the remedy

provided by law for holding juveniles accountable.  RCW 13.40.040; *Smith*, 84 Wn.2d at

501 (remedies are substantive law).  The majority would recognize this distinction if it

followed *Fields*' reasoning that the mechanics of bringing a defendant to court such as

7

form and timing is procedural; who decides the procedure and who is subject to it is substantive. *See* RCW 2.04.190; *Fields*, 85 Wn.2d at 129.

The unique status of the juvenile court is also worth noting. The juvenile court as a separate division of the superior court was *created by the legislature*. *State v. Posey*, 174 Wn.2d 131, 136-37, 272 P.3d 840 (2012). We have recognized the central role lawmakers have played in regulating juvenile courts. *E.g.*, *State v. S.J.C.*, 183 Wn.2d 408, 419, 352 P.3d 749 (2015) ("The legislature has always set policies specifically regarding and restricting the openness of juvenile court records"). Indeed, the legislature substantially *restructured* juvenile courts in 1977. *Id.* at 420. The legislative branch's significant presence in *creating* and regulating the juvenile courts belies the idea that the juvenile court's authority to issue bench warrants resides in this court's rule making power. The majority's discomfort with the notion that the legislature directly governs a juvenile court's issuance of warrants does not make it a violation of separation of powers. *See Colvin*, 195 Wn.2d at 892 n.5; *Wash. State Bar Ass'n v. State*, 125 Wn.2d 901, 912-13, 890 P.2d 1047 (1995) (Dolliver, J., dissenting) ("[S]eparation of powers must be viewed . . . [as] overlapping functions that permit[] even some direct control by one branch over another.").

Even assuming the majority is correct that JuCR 7.16 is procedural, the rule's effect on the Juvenile Justice Act tells a different story. The majority dismisses this concern out-of-hand, concluding that an effect cannot transform a procedural rule into a substantive one. Majority at 19 (citing cases). I disagree.

Justice Brandeis observed that the function of court rules "embraces, among other things, the regulation of the forms, operation *and effect of process*." *Wash.-S. Navigation Co. v. Balt. & Phila. Steamboat Co.*, 263 U.S. 629, 635, 44 S. Ct. 220, 68 L. Ed. 480 (1924) (emphasis added). In *Marsin v. Udall*, 78 Ariz. 309, 312, 279 P.2d 721 (1955), the Arizona Supreme Court recognized that procedural rules can affect substantive law, with constitutional consequences. *Marsin* concerned the right to a fair and impartial trial before a fair and impartial judge. *Id*. The Arizona high court observed that any court rule "that operates to lessen or eliminate [a substantive] right is of no legal force." *Id.* The United States Supreme Court has held "that under some circumstances a procedure that had such effect offended the due process clause of the Federal constitution." *Id.* (citing *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927)).

The Court of Appeals below recognized that "[m]any rules live in a 'borderland where procedure and substance are interwoven.'" *State v. A.M.W.*, 30 Wn. App. 2d 472, 484, 545 P.3d 394 (2024) (quoting *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 471 (7th Cir. 1984)). The separation of powers doctrine asks not whether "two branches of government engage in coinciding activities, but rather whether the activity of one branch . . . invades the prerogatives of another." *Zylstra*, 85 Wn.2d at 750. Properly understood, rule making is a shared activity between the legislature and the judiciary. *See Sackett v. Santilli*, 146 Wn.2d 498, 506, 47 P.3d 948 (2002) (stating that RCW 2.04.190 recognizes the "coextensive authority" of the legislature and judiciary to prescribe procedural rules).

9

The effects of such an activity can invade the prerogatives or substantive authority of another branch. *Id.*; *Marsin*, 78 Ariz. at 312.

JuCR 7.16 deprives a judge of what is often the *only* tool available to them to bring a juvenile into court unless that juvenile poses a serious threat to public safety. *A.M.W.*, 30 Wn. App. at 482. If a juvenile ignores a summons, the judge has no ability to enforce the Juvenile Justice Act. RCW 13.40.010(2)(c) ("[T]he legislature declares the following to be equally important purposes of this chapter: . . . Make the juvenile offender accountable for his or her criminal behavior.").

Here, the majority dismisses the effects of procedure pursuant to our juvenile sentencing cases. Majority at 18-19. The majority explains that some of the juvenile sentencing cases announced a "substantive constitutional rule" and others laid out mandates "'necessary to effectuate that substantive rule.'" *Id.* (quoting *In re Pers. Restraint of Ali*, 196 Wn.2d 220, 237, 474 P.3d 507 (2020), and citing *State v. Houston-Sconiers*, 188 Wn.2d 1, 18-19, 391 P.3d 409 (2017)). Later cases characterized these mandates as procedural, rather than substantive. *Id.* at 19 (citing *In re Pers. Restraint of Williams*, 200 Wn.2d 622, 632, 520 P.3d 933 (2022)). According to the majority, these later cases recognized the effect of procedural rules on children's constitutional right to be free of cruel and unusual punishment, but that effect did not "transform" them into substantive rules. *Id.* (citing cases).

Contrary to such reasoning, our juvenile sentencing cases provide no guidance on the matter at hand. First, the substance-procedure dichotomy is relevant here under the

10

*separation of powers doctrine* and not for purposes of *retroactivity on collateral review*—

the concern of many of our juvenile sentencing cases cited by the majority. Whether

legislation is retroactive may bring up separation of powers concerns, for example, ex

post facto laws. *E.g.*, *Hale*, 165 Wn.2d at 507. But this case does not ask whether a law

is retroactive. Further, the juvenile sentencing cases cited by the majority involved a new

constitutional right and the procedural mechanisms to effectuate it, *both announced by*

*this court*. The present case deals with the interaction between a statute enacted by one

branch of the government and a rule enacted by another on the same topic. Simply put,

the juvenile sentencing cases are inapposite, and it is concerning that the majority

attempts to use them as support.

JuCR 7.16 overrides and changes RCW 13.40.040's requirements for a court to

issue bench warrants for juveniles. The majority concludes this is a procedural matter

and within the court's power. But when a court rule decides what class of people is

subject to a warrant, it is a rule about judicial policy preferences. It is not procedural; it is

substantive. As such, it falls to the legislative branch to decide. Because JuCR 7.16

concerns substantive matters, it violates the separation of powers doctrine.

B. Judicial Rule Making

    1. Rule Making as a Shared Power

The majority claims that rule making is an "inherent" authority of the court, but

that claim is not supported by history or by our case law spanning many decades—cases

decided at a time much closer to the adoption of our Washington State Constitution. In

11

fact, the history of making rules for court operations is complicated, as it has bounced between the courts and the legislative authority even before Washington became a state.

The early history of rule making in America centered in the courts. Charles H. Paul, *The Rule-Making Power of the Courts*, 1 WASH. L. REV. 163, 164 (1926). American courts, like their English cousins, developed process and procedure on a case-by-case basis with occasional insertions by lawmakers seeking to mitigate the rough edges of common law pleading. *Id.*; Hugh Spitzer, *Court Rulemaking in Washington State*, 6 U. PUGET SOUND L. REV. 31, 45 (1982). By the 19th century, these court-made procedures had become overly technical, and the courts were slow to correct them. Paul, *supra*, at 167. To resolve this situation, American lawmakers took matters into their own hands. *See id.* New York, for example, transferred the majority of its "procedural regulation from the courts to the legislature." *Id.*

Washington followed suit. In 1854, the territorial legislature dispensed with common law and adopted the code approach, in which the legislature enacted most court rules, including procedural regulations. Spitzer, *supra*, at 45-46. This court *acknowledged* legislative primacy in matters of procedure in *State ex rel. King County v. Superior Court*, 104 Wash. 268, 273-74, 176 P. 352 (1918).[1]

The code system, like the common law, proved to be a less than ideal solution. As the size and complexity of the procedural code grew, it became rigid and challenging to

---

[1] *Cf.* Charles H. Paul, *The Rule-Making Power of the Courts*, 1 WASH. REV. 223, 227 (1926) ("So that at the birth of Washington Territory the rule-making power was apparently dual.").

12

amend. Paul, *supra*, at 168-69; Spitzer, *supra*, at 46. In response, Washington's 1925

legislature voted to "delegate[] most of its power over procedure to the supreme court."

Spitzer, *supra*, at 46; LAWS OF 1925, 1st Ex. Sess., ch. 118, § 1 (codified at RCW

2.04.190) ("An Act . . . *authorizing* the Supreme Court to make rules relating to pleading,

procedure and practice in the courts of this state." (emphasis added)). Reformers justified

this move not as a delegation of exclusively legislative power but as a power shared with

the judiciary. Spitzer, *supra*, at 49.

The court adopted that view in *State ex rel. Foster-Wyman Lumber Co. v. Superior

Court*, 148 Wash. 1, 4-5, 267 P. 770 (1928). At issue in that case was whether the 1925

act was an impermissible delegation of legislative power. *Id.* at 9. *Foster-Wyman* held

that it was not. Though the court noted some legal and historical authority for viewing

rule making as a "purely" judicial function, it did not decide the case on that ground. *Id.*

at 4, 5 ("The point here in controversy can be decided upon a far more stable

foundation."). *Foster-Wyman* reasoned that while the legislature had functioned since

statehood as the source for court procedure and practice, rule making was not *exclusively*

legislative. *Id.* at 4. As such, power to set court rules could properly be delegated to the

court, which is always in session and without the delays of law making. *Id.* at 7-8.

2. Claiming Inherent and Constitutional Power over Rule Making

For four decades, Washington courts discussed rule making as a power statutorily

*delegated* to the judiciary. *E.g.*, *Pavelich*, 153 Wash. at 381 ("Much learned argument is

devoted by appellants to the rule-making power of this court, by virtue of Laws of

13

1925."); *In re Welfare of Messmer*, 52 Wn.2d 510, 511-12, 326 P.2d 1004 (1958) ("RCW 2.04.190 gives the supreme court the power to prescribe the forms and procedure regarding writs, 'and generally to regulate and prescribe by rule . . . pleading, practice and procedure to be used in all suits.'" (quoting RCW 2.04.190)); *Ashley v. Superior Court*, 82 Wn.2d 188, 197, 509 P.2d 751 (1973) ("The courts are permitted by statute to adopt rules from time to time.").

The language changed abruptly in *Smith*, 84 Wn.2d at 502. At issue in *Smith* was a trial court's refusal to grant bail to a defendant appealing their conviction. A statute mandated bail on appeal with limited exceptions while this court's rule allowed courts to deny bail based on a defendant's flight risk or substantial danger. *Id.* at 501. *Smith* decided the case pursuant to court rule. *Id.* Invoking the court's "limited inherent powers" to set procedural rules, *Smith* stated that in its opinion, the power to grant bail is a function of the judicial branch and "implicit[ly]" procedural. *Id*. at 501-02. *Smith* also offered an "alternative" rationale: the legislature's delegation of power to make procedural rules via RCW 2.04.190. *Id.* at 502. Importantly, however, *Smith* did not discuss the origin of the court's inherent power. *See id.* at 501 (citing cases from other jurisdictions); Spitzer, *supra*, at 50.

The court provided an ostensible source for this authority in *Fields*, 85 Wn.2d at 129. There, defendants were charged with misdemeanors and moved to suppress evidence obtained by a search warrant issued under the court's criminal rules. *Id.* at 126-27. The trial court quashed the warrant, reasoning that warrants were limited by statute

14

to investigating felonies while the court rule impermissibly expanded the grounds for warrants to all crimes, including misdemeanors. *Id.* at 127. *Fields* disagreed and reversed, upholding the warrant pursuant to court rule.

Noting "several grounds" for its holding, *Fields* relied on RCW 2.04.190 *and* inherent authority. *Id.* at 128-29 ("[p]roceeding under either the statutory authority or the inherent power of the court"). The court also provided a source for this claimed authority—article IV, section 1 of Washington's constitution. *Fields*, 85 Wn.2d at 129. Article IV, section 1 states that "[t]he judicial power of the state shall be vested in a supreme court, superior courts . . . and such inferior courts as the legislature may provide." But *Fields* did not explain how the provision expresses any specific, inherent judicial power over *rule making*. *See Bellingham Bay Improvement Co. v. City of New Whatcom*, 20 Wash. 53, 57-58, 54 P. 774 (1898) ("Section 1 of article 4 of the constitution . . . is more in the nature of a declaration of the names of courts than it is of a definition of judicial power.").

Section 24, on the other hand, specifically calls out the authority of the superior courts of this state to establish rules for their governance but is entirely silent on rule making authority of the Supreme Court. WASH. CONST. art. IV, § 24. *Foster-Wyman* interpreted this provision not as a constitutional grant of power but as a means of ensuring uniform rules of procedure. 148 Wash. 10. Nevertheless, section 24 is the *only* constitutional provision that speaks to *any* court's authority to prescribe procedural rules. Section 24 empowers superior courts to set rules limited to procedures necessary to keep

15

the system running and resolving cases. We have recognized that the express mention of one thing implies the exclusion of the other. *Yelle v. Bishop*, 55 Wn.2d 286, 295, 347 P.2d 1081 (1959). The specific language in section 24 and the general language of section 1 highlight the constitution's silence on this court's claimed inherent authority over rule making. Rather, as *Foster-Wyman* recognized, this court received delegated authority from the legislature to promulgate procedural rules. 148 Wash. at 9; *In re Messmer*, 52 Wn.2d at 511-12; RCW 2.04.190.

3. Further Confusing the Court's Rule Making Authority

The year *Fields* was decided, Chief Justice Hale warned of the "still ill-defined concepts of inherent power" in rule making. *State v. Williams*, 85 Wn.2d 29, 35, 530 P.2d 225 (1975) (Hale, C.J., dissenting). The Chief Justice presumed that the authority would be "narrow" and "rarely applied." *Id.* Our subsequent decisions demonstrate just the opposite[2] and have further confused our rule making authority.

---

[2] Far from being rarely applied, the concept of rule making as an inherent power has appeared in numerous cases in this court since *Fields* and *Smith* were decided. *E.g.*, *State v. Templeton*, 148 Wn.2d 193, 213-18, 59 P.3d 632 (2002); *City of Fircrest v. Jensen*, 158 Wn.2d 384, 393-98, 143 P.3d 776 (2006) (plurality opinion); *Gresham*, 173 Wn.2d at 428; *City of Seattle v. Hesler*, 98 Wn.2d 73, 80-81, 653 P.2d 631 (1982); *State v. Stump*, 185 Wn.2d 454, 458-59, 374 P.3d 89 (2016); *Sackett*, 146 Wn.2d at 504-07; *Marine Power & Equip. Co. v. Dep't of Transp.*, 102 Wn.2d 457, 461, 687 P.2d 202 (1984); *City of Spokane v. J-R Distribs., Inc.*, 90 Wn.2d 722, 727, 585 P.2d 784 (1978); *Banowsky v. Backstrom*, 193 Wn.2d 724, 740, 445 P.3d 543 (2019); *Putnam v. Wenatchee Valley Med. Ctr., PS*, 166 Wn.2d 974, 984, 216 P.3d 374 (2009); *Wash. State Council of County & City Emps. v. Hahn*, 151 Wn.2d 163, 168-69, 86 P.3d 774 (2004); *Wash. State Bar Ass'n v. State*, 125 Wn.2d at 908; *City of Spokane v. County of Spokane*, 158 Wn.2d 661, 679-81, 146 P.3d 893 (2006); *In re Salary of Juv. Dir.*, 87 Wn.2d 232, 243, 552 P.2d 163 (1976); *State v. Blilie*, 132 Wn.2d 484, 490, 939 P.2d 691 (1997); *City of Seattle v. State*, 100 Wn.2d 16, 22, 666 P.2d 359 (1983).

16

In *Gresham*, 173 Wn.2d at 428, we stated that the power to promulgate procedural rules is inherent and constitutional pursuant to *Smith* and *Fields*. "The legislature recognized this power in RCW 2.04.190." *Id.* The lawmakers who enacted .190 in 1925 would no doubt be surprised to hear it. At that time, lawmakers and judges recognized their *shared* authority to prescribe court rules. *See Pavelich*, 153 Wash. at 381; *Ashley*, 82 Wn.2d at 197; *Gresham*, 173 Wn.2d at 442 (Madsen, C.J., dissenting) ("Historically, both the legislature and this court have frequently adopted procedural rules . . . there is no constitutional mandate prohibiting the legislature from doing so."). It was not until *Smith* and *Fields*, which were decided more than 40 years later, that this court proclaimed its inherent, constitutional authority over rule making. In other words, our legislature delegated rule making power to the courts because it was "practical, sensible, and efficient—not because of a suddenly discovered 'inherent power.'" Spitzer, *supra*, at 59.[3]

Perhaps the best example of this confused area of the law is the shifting source of authority for the supremacy of court rule. RCW 2.04.200 states rules adopted by the Supreme Court supersede conflicting statutory provisions. Courts have traditionally relied on the statute for this proposition. *E.g.*, *Larson v. Union Inv. & Loan Co.*, 168 Wash. 5, 7, 10 P.2d 557 (1932); *In re Messmer*, 52 Wn.2d at 512; *State v. Striker*, 87 Wn.2d 870, 875, 557 P.2d 847 (1976). After *Smith* and *Fields*, this court eschewed .200

---

[3] One might ask why an "inherent" authority was "delegated" by the legislature. Better, and more faithful to history and case law, is because the rule making authority has been a shared power throughout history.

in favor of our inherent and constitutionally derived power. *E.g.*, *Marine Power & Equip. Co. v. Dep't of Transp.*, 102 Wn.2d at 457, 461, 687 P.2d 202 (1984) (citing WASH. CONST. art. IV, § 1; *Fields*, 85 Wn.2d 126) ("It is within the power of this court to dictate, under the constitutional separation of powers, its own court rules, even if they contradict rules established by the Legislature."); *Sackett*, 146 Wn.2d at 504. But even then, it seems we cannot decide whether the true source of court rule supremacy is inherent or statutory—opting, apparently out of an abundance of caution, to rely on both. *State v. Johnson*, 105 Wn.2d 92, 96, 711 P.2d 1017 (1986) (citing RCW 2.04.200; *Smith*, 84 Wn.2d 498).

4. Problems with *Smith* and *Fields*

*Smith* and *Fields* are marked departures from the court's rule making precedent. Previous decisions had recognized the legislature as the source of procedural rules. *State ex rel. King County*, 104 Wash. at 273-74. Later, after the legislature had statutorily delegated power, case law acknowledged that rule making was neither inherently legislative nor inherently judicial. *Foster-Wyman*, 148 Wash. at 8-9. Rule making was power shared between the two branches. *E.g.*, *id.*; *Pavelich*, 153 Wash. at 381. *Smith* ignored this balance of power and declared, without analysis or supporting authority, rule making an "inherent attribute of the Supreme Court" and the principal rationale for its holding. 84 Wn.2d at 502.

*Fields* provided the same level of analysis as *Smith* to conclude that a search warrant is procedural. That is to say, very little. *Fields* cited but did not examine three

18

cases for the "well established" notion that issuance of a search warrant is part of the criminal process. 85 Wn.2d at 129 (citing *State v. Noah*, 150 Wash. 187, 272 P. 729 (1928); *Brooks v. Wynn*, 209 Miss. 156, 46 So. 2d 97 (1950); *Dunn v. State*, 40 Okla. Crim. 76, 267 P. 279 (1928)). These cases deserve a harder look.

In *Noah*, the only Washington case cited, a defendant argued that a search warrant was void because the application for the warrant was presented to a justice of the peace outside the boundaries of the office. 150 Wash. at 189. This court upheld the warrant, explaining that under the applicable *statute*, the jurisdiction of a justice of the peace is countywide yet the justice may "'issue process in any place in his county.'" *Id.* (quoting REM. COMP. STAT. § 48); *see also State ex. rel. Hodge v. Gordon*, 95 Wash. 289, 292-93, 163 P. 772 (1917) (discussing a search warrant as "initiat[ing] legal process" pursuant to Laws of 1915, ch. 2, § 11). *Noah* held a search warrant qualified as "legal process" under the statute. 150 Wash. at 292.

*Brooks*, a nonbinding case from Mississippi, asserted without analysis or supporting authority that "[i]t is true that search warrants are in the nature of criminal process." 209 Miss. at 162. *Dunn*, another nonbinding case out of Oklahoma, stated that "[a] search warrant is 'process.'" 40 Okla. Crim. at 78 (quoting *McAdoo v. State*, 36 Okla. Crim. 198, 253 P. 307, 308 (1927)). *Dunn* concerned whether a search warrant could be issued by a federal prohibition officer or a private person. *Id*. The court answered no. Under the state legislative code regulating criminal procedure, only certain law enforcement officers could serve warrants. *Id.* (citing art. 19, ch. 7 (COMP. OKLA.

19

ST. 1921)).  *McAdoo* cited the Oklahoma constitution and state statute, specifically a

statute providing a "'substantial form for a search warrant'" enacted by the Oklahoma

legislature.  36 Okla. Crim. at 200 (quoting Attorney General George F. Short's

confession of error).  *McAdoo* concluded "'[t]here can be no doubt but that a search

warrant is a "process" *as contemplated by the Oklahoma Constitution* and the

*corresponding sections of our statutes*.'"  *Id.* (emphasis added) (quoting Attorney

General George F. Short's confession of error).

These cases, with the exception of *Brooks*, involved search warrants in the context

of legislative codes on procedure.[4]  *Fields* ignored this context and categorized the cases

as recognizing search warrants as part of the general legal process in order to apply a

definition of process from yet another case (from another jurisdiction) having nothing in

common with the laws at issue in *Noah* and *Dunn*.  85 Wn.2d at 129.  In other words,

*Fields* relied on cases where statute regulated legal process to conclude that the courts

alone could regulate legal process.  *See id.* at 129-30.[5]

---

[4] As did *Cutler v. Cutler*, 28 Misc. 2d 526, 528, 217 N.Y.S.2d 185 (Sup. Ct. 1961), on which
*Fields* relied for the statement that "legal process" includes "'any form of order, writ, summons
or notice given by authority of law for the purpose of . . . bringing [a person] into court.'"  85
Wn.2d at 129 (quoting *Cutler*, 28 Misc. 2d at 528).  In *Cutler*, the defendant argued the service
of process for a show cause hearing on contempt was illegal under state penal code.

[5] *Fields* applied the definition of legal process in its "'broadest sense,'" but provides no
justification for selecting the maximalist definition of the term.  85 Wn.2d at 129 (quoting
*Cutler*, 28 Misc. 2d at 528).  Nor does *Fields* meaningfully engage with its handpicked
definition.  Process includes any "'*form* of order, writ, summons or notice'" and "'*may* include
all steps and proceedings in a cause from its commencement to its conclusion.'"  *Id.* (emphasis
added) (quoting *Cutler*, 28 Misc. 2d at 528; *Mobley v. Jackson*, 40 Ga. App. 761, 766, 151 S.E.
522 (1930)).  *Fields* does not explain how the grounds for issuing a search warrant qualifies as
the form of a writ and treats *Mobley*'s permissive "may" as mandatory.  *Cf. Spokane County ex*

Smith and Fields did not need to be decided on constitutional grounds. *Ohnstad v. Tacoma*, 64 Wn.2d 904, 907, 395 P.2d 97 (1964) ("We have consistently held that we will not pass on constitutional issues unless absolutely necessary to a determination of the appeal."). Both opinions discussed RCW 2.04.190 as an alternative rational. *Smith*, 84 Wn.2d at 502; *Fields*, 85 Wn.2d at 128. But by resolving the case on the court's inherent, constitutional authority, *Smith* and *Fields* have made RCW 2.04.190 meaningless, contrary to this court's precedent on statutory interpretation. *City of Seattle v. State*, 136 Wn.2d 693, 698, 965 P.2d 619 (1998) ("'Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'").

In sum, *Smith* and *Fields* offer an insupportable foundation on which to assert this court's inherent authority. *See* Spitzer, *supra*, at 50. *Smith* proclaimed authority by judicial fiat. *Fields* tied that authority to article IV, section 1, yet this too amounts to simple fiat because *Fields* did not offer any meaningful analysis of its claimed constitutional source.

As appellate judges, we must do more than declare a point of law. We must show our work. *See Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1248 (9th Cir. 2024) (Forrest, J., concurring). Neither *Smith* nor *Fields* does so. Indeed, by resolving the case on constitutional rather than statutory grounds, *Smith* and *Fields* ignored our

---

*rel. Sullivan v. Glover*, 2 Wn.2d 162, 169, 97 P.2d 628 (1940) ("As a general rule . . . the word 'may' is permissive only and operates to confer discretion.").

21

traditional principle of judicial restraint, and, in doing so, both rendered RCW 2.04.190 meaningless and failed to provide a believable constitutional basis.

*Smith* and *Fields* pronounce broad holdings built on problematic reasoning. Unfortunately, this court is now using these decisions to arrogate more power to this branch than lawmakers could have conceived when enacting RCW 2.04.190 or the drafters of our state constitution intended. *Compare Gresham*, 173 Wn.2d at 431-32 (holding that the rules of evidence are procedural), *with Jensen*, 158 Wn.2d at 394 ("[The] rules of evidence may be promulgated by both the legislative and judicial branches."), *with Pavelich*, 153 Wash. at 382 ("Rules of evidence are substantive law").

It is time to bring history to bear on our rule making precedent. *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349, 41 S. Ct. 506, 65 L. Ed. 963 (1921) ("[A] page of history is worth a volume of logic."). History reflects that rule making is a power delegated to this court by the legislature, and therefore both branches wield it coextensively. While this court has repeatedly asserted inherent, constitutional authority over rule making, our analysis amounts to conclusory statements. *E.g.*, *Smith*, 84 Wn.2d at 501-02; *Fields*, 85 Wn.2d at 129. I would therefore decline to follow those cases.

5. A Different Approach to Inherent Authority

I also urge the court to formulate a more reasoned approach to rule making. Mindful that we share rule making authority with the legislature, separation of powers concerns will always be present when prescribing court rules. As one commentator has noted, in order that government branches operate effectively and protect the integrity of

22

their boundaries, "each division must maintain some exclusive 'trumps' to play against the others when pressed." Spitzer, *supra*, at 52. One such trump is our inherent constitutional power. Though I disagree with the court's prior interpretation of that inherent constitutional power, I agree that it plays an important role in defining the boundaries of judicial responsibilities. In my view, the role of inherent power is limited to prescribing rules to regulate internal court business and protecting the judiciary "in the performance of its constitutional duties." *Juv. Dir.*, 87 Wn.2d at 245.

CONCLUSION

JuCR 7.16 requires a finding that juveniles constitute substantial public threat that RCW 13.40.040 lacks, thus the rule narrows the group of individuals who may be subject to bench warrants. By requiring this heightened showing, the rule also invades the prerogatives of the legislative branch, which made the policy decision to hold juveniles accountable for their offenses. JuCR 7.16 also frustrates the executive branch from carrying out its duty to prosecute cases such as a juvenile who fails to appear at a court proceeding and therefore commits the offense of bail jumping. These intrusions into the legislative and executive branches violate the separation of powers. Because both the statute and rule concern substantive matters, the statute prevails. *See* RCW 2.04.190, .200. I would therefore affirm the Court of Appeals.

I would also take the opportunity to reexamine our rule making precedent, retract the seemingly limitless power this court has claimed to set procedural rules, and adopt a

23

more principled view of that power limited to regulating internal court business and

protecting the judiciary in the performance of its constitutional duties.

    With these considerations in mind, I respectfully dissent.

_____Madsen, J._____
          Madsen, J.

_____Vander, J.P.T_____
        Xcpf gty qqf ."LROV0

No. 103006-1

STEPHENS, C.J. (concurring in dissent)—I largely concur with Part A of the

dissent.   There is a conflict between JuCR 7.16 and RCW 13.40.040 with respect to

the circumstances under which a juvenile may be taken into custody by court order.

While aspects of the court rule may be procedural, the provisions that clash with the

statute fall squarely within the ambit of substantive law, and the rule must yield to

the statute.   I would end the analysis there.

Distinguishing procedural and substantive provisions is not always easy, but

here the court rule establishes new standards that qualitatively change the class of

people for whom a warrant can issue.   The majority is correct that for some

juveniles, a court will be able to make the requisite findings under both the court rule

and statute, and issue a valid warrant. Majority at 22. But the majority is incorrect in concluding that there is no conflict. For a different group of juveniles—those who have failed to appear in court or violated a court order but are not found to pose a serious threat to public safety—a court would not be able to issue the warrant authorized under the statute without violating the court rule.

This clash distinguishes the situation from *State v. Thomas*, 121 Wn.2d 504, 851 P.2d 673 (1993), which concerned the requirements for execution and return of a search warrant. There, as the majority acknowledges, the "triggering dates" for the time limits in both the statute and court rule were "not necessarily apparent" from the plain language. Majority at 23. We were able to insert triggering events to harmonize the statute and court rule, resulting in a scheme that allowed law enforcement to comply with the requirements of both the statute and the court rule in all cases. In other words, absent unforeseen circumstances, law enforcement should always be able to execute a warrant within 10 days of issuance and return that warrant within 3 days of execution. In contrast, JuCR 7.16 is unambiguous and there is no missing language. It states that "[n]o new warrants shall issue" unless the requisite finding is made of a "serious threat to public safety." JuCR 7.16(a)-(b). The statute, on the other hand, authorizes a warrant without such a finding. *See* RCW 13.40.040(1)(a). Thus, when a court finds probable cause that a juvenile has violated a court order but is unable to make a finding that the individual

circumstances of the court order violation or failure to appear pose a serious threat

to public safety, the court cannot issue a warrant that comports with both the statute

and the court rule. The statute and court rule cannot be harmonized under that set

of facts, meaning there is a conflict.

True, bench warrants are a form of court *process*, but it does not follow that

all standards governing the requirements for issuing a warrant are necessarily

*procedural*. *See* majority at 13 (quoting RCW 2.04.190), 15 (quoting *State v.*

*Fields*, 85 Wn.2d 126, 129-30, 530 P.2d 284 (1975)). The dissent persuasively

explains the distinction. A rule that concerns the form or timing of issuing a warrant

and bringing the defendant into court would be undoubtedly procedural. For

example, a court rule could allow a warrant to be issued electronically or require

execution of a bench warrant within a particular time frame. But a court rule that

concerns "the grounds on which a warrant *may issue at all*" is undoubtedly

substantive in that it defines the requirements for bringing a person into custody.

Dissent at 7. The "serious threat to public safety" requirement in JuCR 7.16 is no

less substantive than a rule changing the standard from probable cause to clear and

convincing evidence in order for a warrant to issue.[1]

---

[1] I would not reach the issue of whether the real-world effects of a rule can "transform" an otherwise procedural one into a substantive one. *See* dissent at 8-10; majority at 17-19.

Moreover, the requirement that JuCR 7.16 adds for issuance of a warrant requires a factual finding based on the effects of the juvenile's conduct and behavior. Attaching legal consequences to a person's conduct and behavior is quintessential substance. This is true whether that consequence is punishment itself or merely being brought into court to face potential punishment. *Cf. Schriro v. Summerlin*, 542 U.S. 348, 353, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004) ("A rule is substantive rather than procedural if it alters the range of conduct or class of persons that the law punishes."). Based on the majority's broad definition of procedure, one might ponder whether a court rule could add additional requirements for imposing certain sentences authorized by the legislature.

Both the majority and dissent discuss the origins and boundaries of inherent judicial authority and court rule making power, but I do not believe that discussion is necessary to resolve this case.[2] Judicial restraint should be at its highest when deciding the validity of a rule we ourselves adopted. I would hold that the statute and the court rule here conflict and that the court rule is substantive because it

---

[2] In the course of their discussion, both the majority and dissent go beyond the parties' arguments and raise issues sua sponte—the majority asserting the court rule and statute can be harmonized and the dissent questioning the source of the court's rulemaking power. *Contrast* majority at 20 (acknowledging "[t]he parties both argue that the rule and the statute cannot be harmonized") *with id.* at 22-23 (concluding there is no conflict). *See also* dissent at 18-22 (calling to disavow precedent cited by both parties). I would stick to the issue presented by the parties and decide this case solely on the basis of the conflict between substantive provisions of the statute and court rule.

qualitatively changes the class of juveniles for whom a warrant can issue based on their conduct and behavior. Therefore, the court rule violates the separation of powers as described in our precedent and must yield to the statute. I respectfully concur in the dissent.

_____
Stephens, C.J.